The history of this case is as follows:
On October 26th, 1927, a bill for maintenance was filed. On the same day an order to show cause was advised, ordering the defendant to show cause why he should not be required to make an allowance for the support and maintenance of the complainant pending the suit, and also pay a counsel fee. This order to show cause was heard on November 22d 1927, and conclusions were filed, with the result that on the 5th day of December, 1927, an allowance was made for the sum of $50 per week for maintenance, and on the 21st day of December, 1927, the same was modified, reducing the sum to $25 per week and allowing a counsel fee of $100.
On December 23d 1927, a notice of appeal from said orders was filed, which appeal was heard, with the result that on May 18th, 1928, a decree of affirmance by the court of errors and appeals was filed and the said cause remitted to this court to be herein proceeded upon. In the meantime, on December 17th, 1927, a subpoena ad respondendum was filed, service thereof being duly acknowledged. On January 6th, 1928, an answer was filed, alleging, in effect that an order made in the State of New York, decreeing that the defendant pay to the complainant the sum of $50 per week, was still in force and effect, and that the said order and decree of the State of New York is res adjudicata of the claim for alimony in this court and in this state, further alleging that no suit for divorce or nullity is pending between complainant and defendant. The defendant joined issue on said answer. This allegation of res adjudicata was determined against the defendant upon the hearing of the order to show cause and the decree based upon it was affirmed by the court of errors and appeals.
On the 19th day of June, 1928, an order of reference was made to me, and on the 26th day of June, 1928, the same *Page 617 
was set down for hearing on the 14th day of November, 1928. Hearing was had, with the result that on the 15th day of November, 1928, a final decree was advised decreeing the payment of the sum of $25 per week and the sum of $150 as counsel fee, together with costs to be taxed.
No further action was taken in this court until June 4th, 1931, when a petition was filed praying that the defendant be required to show cause why the amount he is required to pay under the said final decree should not be increased, and an order to show cause was granted thereon. Said order to show cause was continued from time to time until Tuesday, October 27th, 1931. In the meantime, defendant filed an answer alleging "that on the 16th day of May, 1930, he was divorced from the bonds of matrimony from Mary W. Reik, nee Miss Mary L. Watson, to whom he was married on the 17th day of June, 1896; in the State of Morelos, of the United Mexican States, by the judicial department of the court of first instance, in the first district thereof, and by the terms of said divorce he was authorized to remarry; that afterwards, and before the filing of the petition by complainant in the above stated cause, he remarried in the State of Connecticut; that by virtue of said decree, the said Mary W. Reik is no longer the wife of defendant, and no longer entitled to separate support and maintenance from defendant, and praying that said proceedings against him be dismissed and that the order for separate support and maintenance made on the 13th day of November, 1928, be held to be unenforceable and that the same be vacated."
The matter came on for hearing and the complainant alleged that said divorce was fraudulent and invalid in this state, and by consent filed an amended reply to defendant's answer, alleging said invalidity because "defendant was not entitled to a divorce without first having obtained a bona fide domicile in Mexico, and with a bona fide purpose of retaining said domicile and residence;" that he "never obtained a bona fide domicile or residence in Mexico, nor did he even intend to obtain the same;" that the decree was obtained "by reason of the fact that the defendant withheld from the *Page 618 
court the fact that he was not domiciled or resident in Mexico; that his stay in Mexico was purely temporary;" and that "by reason thereof he committed a fraud upon the courts of Mexico, not having obtained a domicile therein, and also committed a fraud upon the complainant, and that his proceeding in Mexico to procure such decree was not bona fide;" and praying that such decree may be declared to be fraudulent and void.
At the time of the hearing, the defendant insisted that the form of pleading adopted in this case did not comply with the rules as set down in Feickert v. Feickert, 98 N.J. Eq. 444,
and that the proper pleading should have been that the petitioner (complainant) should have pleaded the divorce and the alleged invalidity in the petition. The cases are quite dissimilar.Feickert v. Feickert, was an ex parte divorce case. The present proceeding is upon a petition to increase the amount to be paid by the husband (defendant) to the complainant, for maintenance under decree of this court, and which decree had been complied with by the defendant both before and after he had obtained the alleged divorce. It is unnecessary to now determine what order this court would have made had the defendant moved to have had the original decree set aside or to have dismissed the petition now under consideration by reason of the fact that the defendant had obtained the said divorce and that the complainant knew thereof by reason, in fact, that a copy had been served upon her. He took no such steps, but filed an answer alleging the divorce. The amended reply brings the matter at issue upon the point in controversy, which is — are the defendant and wife married or have they already been validly divorced? Using the chancellor's language, that is the crux of this case. Is the Mexico decree fraudulent? If not, Dr. Reik's divorce is as valid here as there. If it is fraudulent, it is invalid here, though it may be treated as valid there.
The decree filed in the court of first instance, civil branch, first judicial district of the State of Morelos, United Mexican Courts, under the heading "conclusions of law," inter alia, recites: "The jurisdiction of this court is well established, *Page 619 
in view of the fact that the complainant has faithfully complied with the requirements of articles 4 and 12, in that he has proved to the satisfaction of the court that he has established his domicile in this city as such in his written complaint, and, therefore, it is beyond question that the court is competent to take cognizance of and determine the present action for divorce, said city being Cuernavaca, Morelos."
Section 33 of the Divorce act of this state provides that —
"Full faith and credit shall be given in all courts of this state to a decree of annulment of marriage or divorce by a court of competent jurisdiction in another state, territory or possession of the United States when the jurisdiction of such court was obtained in the manner and in substantial conformity with the conditions prescribed in sections five, six and seven of this act. Nothing herein contained shall be construed to limit the power of any court to give such effect to a decree of annulment or divorce by a court of a foreign country as may be justified by the rules of international comity; provided, that if any inhabitant of this state shall go into another state, territory or country, in order to obtain a decree of divorce for a cause which occurred while the parties resided in this state, or for a cause which is not a ground for divorce under the laws of this state, a decree so obtained shall be of no force or effect in this state."
The grounds upon which the Mexican decree was granted were "incompatibility of character amounting to cruelty to plaintiff, and the abandonment without cause of the marital home by the wife for more than six consecutive months" neither of which is a ground for divorce under the laws of this state.
I find as a fact that the complainant did go into the State of Morelos, in the country of Mexico, in order to obtain a decree for divorce. His testimony upon that point is that he entered that country on a passport granted for a period of six months, to visit or to travel, and that he obtained what is denominated a "tourist card" which, when translated, was as follows:
"Immigration Service, Special card for tourists, number 07330. Citizens and persons coming within section 4 of article 26 of the law. Card number. Issued by the Immigration Department, Neuro Laredo, Tamaulipis, to Mr. Henry O. Reik on the 25th of March, 1930, a photograph is dispensed with for lack of time, age sixty-one, *Page 620 
married, profession doctor, nationality American, domicile Atlantic City, New Jersey, place to where he is going Mexico, Federal District, motive of the voyage recreation, signed Henry O. Reik, signature of the interested party; persons accompanying the bearer, none. The present card is valid for one return voyage or for a stay in Mexico or outside of Mexico provided such stay does not exceed six months, and can be canceled at any time if the present persons to whom it refers make an undue use of the same. Signed by [some name is not legible] Immigration Official. Notice. The declaration of the interested parties is sufficient to be accepted as true in so far as refers to data provided with respect to their age, civil status, profession, domicile, place of destination and motive of voyage, but it is indispensable that they fully prove their nationality, the fact of not complying with this requirement being sufficient to cause refusal of the card.
"Persons entering Mexico as tourists protected by a card such as this are exempt from paying an immigration tax but if, for any supervening cause duly proved, the stay in Mexico is prolonged beyond six months, thereby contract an obligation to comply with the requirements called for by this claim as immigrants, including the payment of a tax and registration in the registry of foreigners, all of which will be done through the government's office. If, to elude the compliance of such requirements, any one declares himself to come as a tourist and remains in Mexico more than six months without giving notice of these circumstances to the government secretary's office, or paying the respective tax, such person is subject to the corresponding penalty and will be expelled from the country."
That he determined to take up his legal residence in Mexico after his visit on or about March 22d 1930; that he resumed his legal residence in the United States of America on or about the 10th day of April, 1930; that in response to the question, "do you consider that you had ever abandoned your legal residence in the United States?" his reply was "temporarily, I suppose it would be called so," and in response to the question, "what do you mean by temporarily?" he replied, "I mean that when I registered as a citizen or took domicile in Mexico it was with the intention of interposing a suit for divorce and that I should remain there so long as it might be necessary." He stated further that he intended to return to America as soon as he obtained the divorce; that he did not go to Mexico with the primary intention of procuring a divorce, but that it was secondary; that his primary motive was — "I went to Mexico on a granted mid-winter vacation from my work for a period of rest, also for the purpose *Page 621 
of some business investigations of a private nature and with the matter in mind that I should make inquiries and investigations as to the divorce laws of Mexico, so that if I found that I could honestly meet the requirements of that law I would institute a suit for divorce."
It is manifest that his purpose in going to Mexico was to obtain a divorce and that he had no intention of becoming a permanent resident of that country.
In Pahy v. Pahy, 107 N.J. Eq. 538, the court of errors and appeals, said: "The law is settled in this state that, where the court in which the divorce was obtained has jurisdiction over the subject-matter and its powers are limited to the granting of relief to a resident of the state, its adjudication that the complainant is such resident is final, unless it is made to appear that the court was led to this conclusion by fraud perpetrated upon it by the complainant; and that fraud is a fact that will never be presumed, but must always be clearly and convincingly proved."
The general rule is that jurisdiction over the subject-matter of divorce rests upon domicil, or at least residence animomanendi, of at least one of the parties, and it is established by the great weight of authority that, notwithstanding the full faith and credit provision of the federal constitution, a decree of divorce rendered in one state may be impeached and denied recognition in another upon the ground that neither of the parties had such domicil or residence at the divorce forum; and this, notwithstanding the recitals in the decree or record from the other state of the jurisdictional fact of domicil or residence. 39 A.L.R. 677, and cases therein cited.
Using the language of Vice-Chancellor Leaming in Sechler v.Sechler, 94 N.J. Eq. 47 (at p. 49): "The case thus comes within the very terms of the statute above quoted [section 33 of the Divorce act], and by the terms of that statute the Mexican decree is of no force or effect in this state. The sufficiency of the legislation above referred to cannot be said to be an open question in this court." *Page 622 
In Feickert v. Feickert, supra, the chancellor said, referring to section 33 of the Divorce act: "I am aware that in several cases in chancery, the provisions of our statute above quoted has been given force and effect. See Jung v. Jung,85 N.J. Eq. 372; Lister v. Lister, 86 N.J. Eq. 30; Thompson v.Thompson, 89 N.J. Eq. 70; Hollingshead v. Hollingshead,91 N.J. Eq. 261; Sechler v. Sechler, supra; Garrabrant v.Garrabrant, 95 N.J. Eq. 136."
Further, the chancellor says: "Of course, if a resident of this state goes into another state to obtain a divorce and does not acquire a bona fide residence there, such divorce will be null here, but its nullity will have to be proved here. And it is not in every case of one going into another state for the purpose of obtaining a divorce that this court will adjudge such divorce fraudulent for that reason. Judge Vroom, speaking for the court of errors and appeals in Wallace v. Wallace, 65 N.J. Eq. 359
(at p. 364), said: `I concur entirely in the principle laid down by the special master in this case that a person may legitimately move to another state in order to avail himself of the laws of that state, and this includes, necessarily, the right to remove into the jurisdiction of this state for the purpose of procuring a divorce, the only requirements being absolute good faith in the taking up of such residence and the animusmanendi; in other words, the factum of residence and theanimus manendi proves the domicile.' Mogowan v. Mogowan, 12Dick. Ch. Rep. 324; Harral v. Harral, 12 Stew. Eq. 285; see, also, Rinaldi v. Rinaldi, 94 N.J. Eq. 14."
The fact that personal service was made upon Mrs. Reik in the State of Maryland does not change the situation. In Knill v.Knill, 195 N.Y. Supp. 398, a decree of divorce obtained by the husband in Nevada was denied recognition or effect in a suit in New York for the annulment of a marriage contracted by the husband after the Nevada decree, upon the ground that he had not acquired a bona fide domicil in Nevada. While it appears in this case that the service in the Nevada divorce suit was made personally upon the wife *Page 623 
in Connecticut, and she did not appear, the court said that the fact that the wife deserted the husband without cause before he went to Nevada did not change the situation, since a bona fide
residence in Nevada on his part must be acquired in any event. The court further observed that her appearance or consent could not have conferred jurisdiction, and it follows that her recognition of the divorce did not. At the outset of the New York suit it was stipulated that the husband became a resident of Nevada before he obtained the decree, and that stipulation was not withdrawn; but the court said it was not binding upon the court in the face of the evidence showing that he did not have abona fide domicil.
After an elaborate discussion in an opinion rendered by Mr. Justice Bradley in the supreme court of the United States, inThompson v. Whitman, 85 U.S. (18 Wall.) 457, the court reached the conclusion as stated in the syllabus. "Neither the constitutional provision that full faith and credit shall be given in each state to the public acts, records and judicial proceedings of every other state, nor the act of congress passed in pursuance thereof, prevents an inquiry into the jurisdiction of the court by which a judgment offered in evidence was rendered. The record of a judgment rendered in another state may be contradicted as to the facts necessary to give the court jurisdiction, and, if it be shown that such facts did not exist, the record will be a nullity, notwithstanding it may recite that they did exist." 8 L.R.A. (N.S.) 842.
In determining whether the complainant has acquired a residence in the state, as required by the statute, as in other cases where residence or domicil is to be determined, there must have been an intention to remain in the state — an animus manendi.9 R.C.L. 403. So it is generally held that merely going to a state for the purpose of securing a divorce, and residing there the required length of time, but without any intention of remaining there permanently or indefinitely, is not sufficient to give jurisdiction in divorce proceedings. *Page 624 
The general rule is that domicil is changed from one place to another, or one state to another, only by the abandonment by a person of his first place of domicil with the intention not to return, and by taking up his residence in another place with the intention of permanently residing in that place. 9 R.C.L. 542.
The first essential for the validity of a foreign decree is that it should be pronounced by a court of competent jurisdiction between the parties who are bona fide subjects of that jurisprudence. In this country it is prescribed by constitutional compact that full faith and credit must be given in each state to the public acts, records and judicial proceedings of every other state; and yet it is well settled that the record of a judgment rendered in another state may be contradicted as to the facts necessary to give the court jurisdiction, and, if want of jurisdiction appear upon the face of the record, or is shown either as to the subject-matter or the person, or, in proceedingsin rem, as to the thing, the record will be regarded as a nullity. Thompson v. Whitman, 85 U.S. (18 Wall.) 457, and other cases.
The rule is certainly as strong, if not stronger, when applied to a judgment rendered in a court of a foreign country, toward which no such duty is enjoined, and especially where the jurisprudence of such foreign country is in no sense based upon the common law. St. Sure v. Lindsfelt, 82 Wis. 346;19 L.R.A. 515.
Using the language of Vice-Chancellor Bentley in Robins v.Robins, 103 N.J. Eq. 26: "It seems to me that the facts are quite as strong as those upon which the court of errors and appeals impeached the decree considered in Magowan v. Magowan,57 N.J. Eq. 322. In that case, although the decree of the court in Oklahoma divorced the parties, and, therefore, raised a presumption of compliance with all the requirements of the Oklahoma law, the court of errors and appeals determined from the facts presented that the decree must have been obtained, either by withholding from the other court the real facts or by the submission of false testimony." *Page 625 
Still using the language of Vice-Chancellor Bentley, but fitting the facts to the case at bar, it would be unfair to the courts of the free and sovereign State of Morelos, United Mexican States, to presume that the judicial department of the court of first instance, in the first district, would have adjudicated that the defendant had proved to the satisfaction of the court that he had established his domicile in this city (Cuernavaca) if it had been shown to that court that the defendant had been domiciled and resided in New Jersey for a number of years, had registered as a voter in Atlantic City, was under contract of employment by the New Jersey Medical Society, acted as executive secretary thereof; that he went to Mexico on a granted mid-winter vacation from his work, for a period of rest, with the matter in mind that he would make inquiries and investigations as to the divorce laws of Mexico * * * so that if he found that he could honestly meet the requirements of the law he would institute a suit for divorce, having consulted a lawyer prior thereto, who referred him to his brother, who was a lawyer in Mexico, with offices in Mexico City and Cuernavaca, who was his attorney in the divorce proceedings; that he was admitted into Mexico on a passport and obtained what was denominated a "tourist card," permitting a residence for six months; that he registered in the city of Mexico as a resident of Atlantic City; that he retained an attorney to procure a divorce and that after four days the defendant and the attorney went to Cuernavaca, where the attorney registered him at a small hotel, the defendant presuming that he was registered as having come from Atlantic City, and only remained there one day, then went back to the Hotel Geneva in Mexico City, and the first registration at the Hotel Geneva, so far as the hotel was concerned, was not changed, and he did not re-register; that he remained at that hotel only two days and appeared in court one day, and from there came back to Atlantic City, not directly but indirectly, and has never been back in Mexico since; and that his employment by the Medical Society and the compensation from it and the editing of *Page 626 
its journal continued without interruption; that he returned to his residence in Atlantic City and shortly thereafter remarried, and still retains his place of residence, the same as prior to his trip to Mexico.
Still quoting Vice-Chancellor Bentley in Robins v. Robins,supra, "finally, there is no question of comity, because it is universally the law that effect will not be given to any judgment of a foreign state that is infected by fraud. * * * Finally, it is argued that this defendant had a perfect legal right to change his domicile and with it his residence, and no one will deny that this is so. My difficulty is to convince myself that he had any such intention at the time he entered Mexico, so far as making any portion of that country his fixed and legal residence. Surely one may take notice of the increased number of unhappy spouses who are constantly gathering in certain jurisdictions where marriages are dissolved upon grounds not recognized in the respective jurisdictions in which they have previously spent their lives. It is equally notorious that immediately upon receipt of the decrees they seek, they almost universally find that their new surroundings have lost all attraction and thereupon return to places that have previously been their homes, except in a case like the present one where there exists an awkward judgment, or a threat of one, which cannot be overcome. I know of no case which appears clearer than the one made out by the facts in the bill, if they are true. The very authorities upon which the defendant relies support the statement just made. For example, in 19 C.J. 370 ¶ 836, the concluding clause on this subject is — `he is free to change at his pleasure, provided the change is a bona fide one, and a divorce so acquired will be recognized in the state of his former domicile.' In Magowanv. Magowan, supra, the court of errors and appeals stressed the necessity of the element of the animus manendi in the establishment of a new residence, citing Harral v. Harral,39 N.J. Eq. 279. The reasons for believing [from a reading of the bill] that there was no such intention have already been given. Vice-Chancellor Stevenson, in *Page 627 Hunter v. Hunter, 64 N.J. Eq. 277, said that where a party files a petition promptly upon the expiration of the statutory period of residence required, when he has come from a jurisdiction that does not recognize as a cause for divorce the one upon which he relies, a presumption arises against the honesty of his residence here."
Dr. Reik returned to his residence in the United States on or about April 10th, 1930, at least a month prior to the entry of the order declaring the decree final, which was made on the 16th day of May, 1930, making final the decree rendered on the 12th day of May, 1930.
Therefore, the divorce granted by the Mexican court must be declared to be invalid in this state.
Now, should the amount of maintenance be increased? Dr. Reik testified his income for the last five years to have been from $3,612, the lowest, to $4,547, the highest, with the average $4,022.98. At the present time he is also receiving $75 per month the same being one-half of the rental of his apartments making his income $4,922.98 per year.
An allowance of $32.50 per week would be about one-third of his income, and an order modifying the decree to read that amount will be advised. *Page 628