In the Matter of the Estate of EDWARD H. MILLER, Deceased.

Surrogate's Court, Kings County, March 19, 1937.

*Straus & Osserman,* for Claire Paster Miller.

*Benjamin C. Ribman,* for Sylvia Smith, daughter of deceased.

*David Harrison,* for the executors.

WINGATE, S. This litigation, innately disagreeable by reason of its plethoric demonstration of the more sordid of human traits, but rendered superlatively so by the inability of the parties to confine themselves to relevancies and their evident competition in vituperation, invective and discourtesy, has been remitted to this court under quite unusual circumstances.

Whereas in most probate proceedings the results attained are of slight interest to any but the immediate parties, there is here involved a principle of practice affecting substantive rights which cannot fail to be of moment to many courts and a vast army of litigants. In view, therefore, of this fact and of the intimation that further appellate review is contemplated, it appears expedient to discuss the relevant facts and legal considerations in some detail, to the end that the issues be made clearly evident and that the higher courts, if further review actually eventuates, be not compelled unnecessarily to wade through the morass of irrelevances with which both litigants have overburdened the record.

Edward H. Miller, the present decedent, died at Miami, Fla., on March 7, 1936. With extraordinary speed, in view of the distance of the place of death from this city and the intervening orthodox

period of mourning, a purported will was filed for probate in this court. This took place on March nineteenth. Accompanying the petition for its probate were waivers of notice and consents to probate, executed by all of the statutory distributees.

*Four days* after the filing of these papers, namely, on March twenty-third, and before any court action whatsoever looking to the probate had taken place, Sylvia Smith, a daughter of the decedent and obviously a statutory distributee, applied for and obtained from this court an order directing that cause be shown why she should not be permitted to withdraw her consent to probate and be authorized to file objections to the validation of the propounded instrument. This was, obviously, merely a motion in the then pending proceeding for probate. Since the only parties who had appeared therein were the proponent-executors, they were the sole individuals required to be served. They were so served, and, on the return day of the citation, consented in open court to the granting of the relief prayed. It was accordingly awarded by order dated March twenty-sixth. Two days later, on March twenty-eighth, the proponents filed an amended petition for probate, to which the daughter filed objections on April fourth.

On April sixteenth, Claire Paster " Miller," a legatee under the propounded instrument, who claims the status of wife of the decedent, and who, for the purpose of avoiding the semblance of ruling upon the controversial issue of her status, will hereinafter be designated as " Claire," duly appeared by attorney, pursuant to her written authorization acknowledged on the tenth. Simultaneously with the filing of this notice of appearance, this attorney filed a demand for " a trial by jury of the issues raised in the contest of the will by the answer interposed by Sylvia Smith," and on April twenty-first made a motion based on Claire's affidavit, verified on April eighteenth, requiring Sylvia to furnish particulars of her objections.

It may be observed, in passing, that these actions obviously predicated on the existence of a valid issue in the proceeding, might serve as the basis for argument that the irregularity, if any, in the opening of the daughter's default, was waived. (*Lord Construction Co.* v. *Edison Portland Cement Co.*, 234 N. Y. 411, 415. See, also, *Alsens A. P. C. Works* v. *Degnon Contracting Co.*, 222 N. Y. 34, 37; *Ansorge* v. *Belfer*, 248 id. 145, 150; *Draper* v. *Oswego County Fire Relief Assn.*, 190 id. 12, 16.)

By instrument dated April twenty-ninth, Claire displaced her original attorney of record and substituted her present counsel. On May twenty-third the new attorneys procured an order directing the daughter to show cause why the order of March twenty-sixth,

granting her permission to withdraw her waiver of the right to service of papers and consent to probate, and authorizing her to file objections, should not be vacated.

The relief sought in this application was denied by this court by a decision filed on June ninth, which appeared in the *New York Law Journal* on the following day (p. 2971).

Thereafter a motion was made to strike out the objections which, as noted, had been filed on April fourth. This was denied by memorandum dated September sixteenth. Obviously this second motion was in substance merely an attempt to secure a reargument by indirection of the prior one, since the objections of the daughter were in usual " omnibus broadside " form. The attack upon them was accordingly merely a renewal of the attack upon her right to file objections at all, since, if only deficient in definiteness, they were subject to amplification by a bill of particulars in accordance with the customary practice in this court.

An appeal from the orders entered on the denial of these two motions was prosecuted by Claire to the Appellate Division, which reversed " on the law and the facts " by a three to two vote. The first memorandum decision written in this connection read (*Matter of Miller*, 249 App. Div. 752): " In our opinion, the record discloses a complete failure upon the part of the respondent to set forth facts forming a basis for the belief that she has a reasonable expectation of success in contesting the will, and the failure to set forth such facts precludes her from obtaining the relief sought, namely, to vacate the waiver and consent which she had executed."

Presiding Justice LAZANSKY and Mr. Justice CARSWELL noted their " dissent and vote to affirm on the grounds that discretion was fairly exercised by the surrogate, and that the merits should not be determined on affidavits."

Momentarily interrupting the recital of pertinent facts, it has, of course, been recognized from time immemorial that an application to open a default and permit the interposition of an answer or to authorize the amendment of a pleading is one primarily addressed to the judicial discretion of the court. (*Rowley* v. *Van Benthuysen*, 16 Wend. 369, 383; *Spalding* v. *Kingsland*, 1 N. Y. 426, 427; *Depew* v. *Dewey*, 56 id. 657, 658; *Lawrence* v. *Farley*, 73 id. 187, 188; *Vanderbilt* v. *Schreyer*, 81 id. 646, 648; *Mayor* v. *Smith*, 138 id. 676.)

Whereas the exercise of this discretion is unquestionably subject to review, it being merely a judicial one, there is a presumption in favor of the propriety of such exercise (*Archer* v. *Archer*, 171 App. Div. 549, 550), and appellate courts will usually not disturb the result attained (*Vanderbilt* v. *Schreyer*, 81 N. Y. 646, 648; *Matter of*

*Sondheim,* 69 App. Div. 5, 6; *American Pin Co.* v. *Tepfer,* 127 id. 939) in the absence of unmistakable (*Wehle* v. *Bowery Savings Bank,* 40 N. Y. Super. Ct. [8 J. & S.] 161, 164) or gross abuse (*Davis* v. *Solomon,* 25 Misc. 695, 697; *De Llamosas* v. *De Llamosas,* 62 N. Y. 618, 619).

In view of the consequent fact that the determination of the majority of the Appellate Division in effect convicts this court of a " gross " and " unmistakable abuse " of the discretion confided in it, and of the intimated probability of ultimate appellate review of this determination, an outline of the legal considerations which impelled this court to the result which it attained may be permissible.

The status of a statutory distributee who has executed a consent in usual form to the probate of a particular alleged will is conceivably viewable in two somewhat differing aspects. He may possibly either be deemed to have defaulted in answer to the allegations of the petition, or he may be viewed as having pleaded thereto by a pleading which neither admits nor traverses its allegations, but, in effect, amounts to a plea of *nolo contendere,* which, while not customarily in vogue in this jurisdiction, is a familiar incident of practice in perhaps a majority of other tribunals of the nation. These somewhat diverse aspects will be considered in order.

Defaults by a party defendant or respondent are roughly classifiable into three groups. At one end of the scale is the familiar inadvertent calendar default, which is uniformly opened in all courts alike with or without the imposition of terms.

At the other extreme is the species of default which has resulted in a material alteration of the status of the parties by reason of the subsequent entry of a judgment or decree making final disposition of the action or proceeding. The limitations upon the authority of a court to return the parties to the situation which they occupied prior to the sufferance of the default are, in this latter instance, precisely and strictly regulated by statutes. In the Surrogate's Court the pertinent enactment is contained in subdivision 6 of section 20 of the Surrogate's Court Act, and in courts of general jurisdiction somewhat similar specifications are incorporated in article 9 of the Civil Practice Act.

Confining the consideration to the procedural enactment in respect to this court, relief in this situation is conditioned on a demonstration of the existence of " fraud, newly discovered evidence or other sufficient cause " of like nature, to which the courts, by continuous and uniform determination, have added the requirement that a demonstration shall be made by the suppliant for relief of the merits of his cause; in other words, of the probability of his

ultimate success were the desired relief to be accorded and he to be remitted to the situation which existed before the default occurred. (*Matter of Leslie*, 195 App. Div. 571, 575; *Matter of Elias*, 222 id. 728; *Matter of Jackson*, 134 Misc. 750, 752; affd., 227 App. Div. 777; *Matter of Lindsay*, 136 Misc. 555, 557; affd., 234 App. Div. 841; *Matter of Salomon*, 159 Misc. 379, 384.)

Intermediate between these two general classifications of defaults lies a considerable mass of conceivable situations in which neither of the essential characteristics of either of the two extreme classes are present. Such are the cases in which the default was not inadvertent in the sense that it may so be termed in the usual calendar default and yet where no material alteration of position has taken place and no material prejudice inflicted upon the adverse party by reason thereof as is the situation in the cases in which the entry of a judgment or decree has followed the default.

If the situation of Sylvia Smith at the time of her initial application may be designated a default, the intermediate category was the classification to which it is obviously attributable. However, within four days after it occurred, and before any action predicated thereon had been taken, she applied for relief. The situation of her opponent had in no way been prejudiced by her neglect; indeed, there is no intimation in the record that she was even aware of it; there was no semblance of any contractual relation between them which would inhibit the assertion of the usual right of the defaulting party to her day in court; and no estoppel to claim this basic privilege can be spelled out against her, since there was no change of position or action whatsoever by her opponent in reliance upon such default. (*Lawrence* v. *Brown*, 5 N. Y. 394, 401; *Jewett* v. *Miller*, 10 id. 402, 409; *Manufacturers' & Traders' Bank* v. *Hazard*, 30 id. 226, 230; *Continental Nat. Bank* v. *National Bank of the Commonwealth*, 50 id. 575, 581; *Blair* v. *Wait*, 69 id. 113, 116; *Rothschild* v. *Title Guarantee & Trust Co.*, 204 id. 458, 464; *Olin* v. *Kingsbury*, 181 App. Div. 348, 355.)

In *Baldwin* v. *Yellow Taxi Corporation* (221 App. Div. 717) the court, in discussing the discretionary power of courts to open defaults, observed (at p. 718): " It will usually exercise that power as a matter of general policy to permit actions to be tried on their merits by giving each party his fair day in court. * * * Such motions will be denied ordinarily only when there has been some persistent wrongful conduct, wilfulness or bad faith by a party."

This pronouncement was cited and applied by the Appellate Division of this department in *Long Island Trading Corporation* v. *Tuthill* (243 App. Div. 617), which also cites *Allen* v. *Fink* (211 id. 411), in which the following appears (at p. 415): " It is the

general policy of the courts to permit actions to be determined by a trial on the merits wherever possible, and not to be disposed of by means of some sharp legal jugglery without trial. To that end there is given to courts a large discretion in the control of their own proceedings, in opening defaults in the furtherance of justice, even after judgment entered."

These are but a few of the recent repetitions of the principle so clearly restated three-quarters of a century ago by the General Term in *Leighton* v. *Wood* (17 Abb. Pr. 177, 182): "It would be a mockery of justice to hold a verdict, obtained without a hearing of the case for the defence, where the court could not be fully satisfied that the defendant had no evidence that would materially reduce the verdict or wholly defeat the action. The relief asked for in such cases is usually granted upon terms of compelling the defaulting party to repair the damages which his default has occasioned to the other side * * *. No substantial right of the plaintiff is interfered with. His cause of action remains. He can still pursue his remedy, bring his cause to trial, and obtain his verdict, if his proof will warrant a recovery; and if it will not, certainly it would be a reproach to the administration of justice to permit a recovery by default, even after negligence on the part of the defendant in preparing his cause for trial." (See, also, *Harriss* v. *Tams*, 258 N. Y. 229, 239, 240; *Crandall Company* v. *Shanley*, 245 App. Div. 787.)

If, as would seem to be indicated from these and innumerable other like statements with which reports are replete, it is the policy of the law to permit every man his day in court, then it appeared to this court that the preliminary demonstration requisite for the according of this fundamental privilege after default by a party should be viewed through the medium of usual equitable considerations. In those instances in which potential prejudice is imaginable by reason of the fault or neglect, a stronger demonstration should be requisite than where, as here, the default was little more than momentary and the result of relief therefrom would be merely to deprive the opponent of an additional advantage to which she had no legal or moral claim, and of which, so far as has been disclosed, she was wholly unaware.

Thus far, the attempted palliation by this court of the offense which the majority of the Appellate Division has branded with the stigma of an "unmistakable," "gross abuse" of judicial discretion (*Wehle* v. *Bowery Savings Bank, supra; Davis* v. *Solomon, supra*) has been predicated upon the conception that the situation of the decedent's daughter at the time of the making of the application was properly designatable as one of "default." Analysis thereof

would seem, however, to cast some doubt on the propriety of its classification in this category.

It has been held (*Wolfert* v. *N. Y. City Railway Co.*, 53 Misc. 536, 537) that where an appearance in an action has been made, no "default" exists. (See, also, *People ex rel. Perrine* v. *Connolly*, 217 N. Y. 570, 573; *Citizens Trust Co.* v. *Prescott & Son, Inc.*, 221 App. Div. 426, 431; *King* v. *Ross*, 28 id. 371, 372.) In the present instance the daughter executed an instrument which was duly filed in this court in which it is recited: " I, Sylvia Smith, * * * do hereby appear in person." In this instrument she asserted her willingness that the propounded instrument be admitted to probate. It is somewhat difficult for this court to appreciate, therefore, how any default, in the proper sense of the term, was suffered by her. The proceeding was one *in rem* or *quasi in rem* for the determination of the validity of a specified instrument and indirectly for adjudication as to the ownership of certain assets of which the instrument may loosely be deemed the symbol. No personal judgment was sought against her in the proceeding. All that was contemplated was an adjudication *in rem* to the effect that by reason of the existence of this document, certain statutory rights which would otherwise be hers, were cut off. In this aspect the proceeding was closely analogous to one to foreclose a mortgage. In either situation, a party has four possible courses open to him. He may wholly ignore the proceeding; in other words, he may " default." He may answer, denying the validity of the instrument. He may answer joining the prayer of the petition or complaint; or finally, he may appear and either with or without express statement in the form of answer signify his intention of not opposing the relief sought by the petitioner. In any of the last three alternative situations there would appear to have been no default, and in any of them in which a written statement of the adoption of a position in respect to the litigation is indicated, it would seem that there must inevitably be an answer, since, under section 260 of the Civil Practice Act, " the only pleading, on the part of the defendant, is an answer."

Section 244 of the Civil Practice Act further provides that " Within twenty days after a pleading, or the answer or reply thereto is served, or at any time before the period for answering it expires, or within twenty days after the service of a notice of motion addressed to the pleading, the pleading may be once amended by the party, of course, without costs and without prejudice to the proceedings already had."

It is thoroughly settled, this statutory right of amendment being absolute, that an entirely new or different cause of action

or defense may be asserted in such amended pleading (*McQueen* v. *Babcock*, 3 Abb. Ct. App. Dec. 129, 132; *Brown* v. *Leigh*, 49 N. Y. 78, 80; *Divine* v. *Duncan*, 2 Abb. N. C. 328, 330; see, also, *Harriss* v. *Tams*, 258 N. Y. 229, 242), with the result that the merit of the proposed pleading is not properly a subject for the court's consideration. (*Sherman* v. *International Publications, Inc.*, 130 Misc. 543, 544; see, also, *Reilly* v. *Waterson, Berlin & Snyder Co.*, 194 App. Div. 446.)

Section 316 of the Surrogate's Court Act enacts that " except where a contrary intent is expressed in, or plainly implied from the context of this act, a provision of law or of rules, applicable to practice or procedure in the Supreme Court, applies to Surrogates' Courts and to the proceedings therein, so far as they can be applied to the substance and subject matter of a proceeding without regard to its form."

This court would be unprepared to affirm without qualification that section 244 of the Civil Practice Act is fully applicable to proceedings in the Surrogate's Court, if for no other reason than the fact that the period therein specified within which such amendment may be made is usually approximately equal to the total time required in this court between the placing of a proceeding at issue and the date when trial may be had. Were it, therefore, to be held that an absolute right to amend within twenty days was available, it would tend to retard the prompt administration of justice and the disposal of litigation which, as is admitted by all, would be detrimental to the public interest. The court can, however, perceive no reason why the spirit of the enactment should not be here applicable, with the result that a litigant should be permitted to amend his pleadings in the usual case as a matter of course provided such action is taken with such promptness as to cause no resulting impairment of the rights of his adversary to an expeditious determination of the issues on the merits.

The arguments of the appellant based on the equitable theory of express waiver may be dismissed by the observation that the only express waiver made was of the right to receive service of papers, and that implied waiver is a purely equitable doctrine which like estoppel will be applied only on a demonstration of deliberate, informed abandonment of known rights (*Alsens A. P. C. Works* v. *Degnon Contracting Co.*, 222 N. Y. 34, 37; *Draper* v. *Oswego County Fire Relief Assn.*, 190 id. 12, 16; *Ansorge* v. *Belfer*, 248 id. 145, 150) which is not only not here demonstrated but is negatived by uncontroverted allegation.

The foregoing considerations are reported merely for the purpose of offering some palliation for that which a majority of the Appel-

late Division has determined to be an unwarranted and unjustifiable act on the part of this court in its initial determination.

The immediate problem which has been remitted for solution remains for consideration. As noted, the original decision of the Appellate Division reversed the order of this court " on the law and the facts " for the reason that " the record discloses a complete failure upon the part of the respondent to set forth facts forming a basis for the belief that she has a reasonable expectation of success in contesting the will."

After the rendering of this decision, a motion for reargument was made, which resulted in a further decision of the Appellate Division, on January 22, 1937 (249 App. Div. 839), reading as follows: " Motion for reargument granted and on reargument the matter is remitted to the Surrogate's Court of Kings county for the purpose of enabling the respondent to submit an affidavit or other papers showing merit and for further determination thereon by the surrogate."

The results of these two pronouncements are obviously, *First*, that the record as then before the court was determined to disclose a " complete failure " of facts warranting a belief that Sylvia Smith might succeed on a contest; and *second*, that she be permitted to repair this defect by submitting further proofs in the form of affidavits which would supply an adequate basis for the grant of relief.

The court does not understand the first memorandum to indicate a determination by the Appellate Division that a showing of merits must be made by the respondent individually if it is elsewhere apparent in the record. As was said in *Gravenhorst* v. *Turner* (215 App. Div. 617, 621): " When a case is tried before the court without a jury the court is to determine the questions of fact, and his determination has every presumption in its favor, the same as the verdict of a jury, and *this is true whether the decision is made upon the plaintiff's testimony or upon the testimony of both parties.*" (Italics not in original.) In other words, the determination of any controversy whether by an appellate tribunal or at *nisi prius* and whether demonstration is made by the medium of oral testimony or on affidavits or other written proofs is to be based upon the showing of the record in its entirety and taken as a whole, and it is wholly immaterial in evaluating the rights of the litigants as to the identity of the party by whom the particular pertinent demonstration was adduced. Any other conception would metamorphose a judicial proceeding from a trial of merits to a pure game of wits and make conceivable the *reductio ad absurdum* that a party might be denied rights which were obviously his as a result

of the clear demonstration of his opponent, for the sole reason that such affirmative demonstration had been made by his opponent and not by himself.

The determination remitted to the court in this proceeding accordingly narrows itself to one of whether the additional demonstration on behalf of the daughter as to her basis "for the belief that she has a reasonable expectation of success in contesting the will" adds so materially to the showing of the record which the majority of the Appellate Division determined to be so utterly inadequate in this regard as to require a summary reversal "on the facts." The preliminary step in this connection is obviously the attainment of a clear conception of just what is demonstrated by the record which was determined to be so completely deficient. In this review, the record on the appeal furnishes a convenient medium, and references, except where otherwise expressly indicated, will be made to it by its folio numbers.

The theory upon which the proposed contest of the will by the decedent's daughter is primarily predicated is that the decedent was induced to make the will in question as a result of false representations that "Claire" was his "lawful wedded wife;" that she was not; and that he would not have executed the instrument had it not been for this erroneous belief induced by these false representations. (See fols. 75–76.)

In 1931 the decedent met Claire Paster (fol. 37), who was a married woman with two children, approximately twelve and seven years of age respectively. She was at that time living separate from her husband (fol. 36). An "attachment" developed between them (fol. 37), as a result of which the decedent gave her "a regular weekly allowance of $50.00 and also paid all other expenses, such as rent" (fol. 39) and contributed to the support of her children (fol. 122). During this relationship the decedent "was a fairly constant visitor in" her home (fol. 121) and they took various trips together to Florida (fols. 128–129) and Mount Clemens, Mich. (fol. 196). She also visited him "every weekend" (fol. 151) when he summered at Jacobs' Hotel at Loch Sheldrake (fol. 150).

The woman's husband still had occasional contacts with his little son, Murray, and the decedent learned "from stories Murray told * * * that Paster [her husband] was aware of the relationship that had developed between" them. "He also knew that he was not sparing the boy's feelings and was making statements to his son 'about the woman' which were better left unsaid to a boy of Murray's age and understanding" (fols. 147–148). The husband furthermore "was very bitter" (fol. 136) and refused to "co-operate" in a divorce (fol. 146).

Thereafter Claire consulted an attorney, who advised her " that a Mexican divorce would suit " their " purposes as well as a Reno divorce." This she reported to the decedent and an appointment was made for them to meet (fol. 43). The gist of the advice which this attorney gave, as stated by him, was: " I told Mrs. Miller at that time, there was little to choose between a Mexican and a Nevada divorce. As long as she and her first husband both resided in this State, I advised her, that neither divorce was recognized in this State. * * * I explained to him as I had to Mrs. Miller, that a Mexican divorce was not valid in this State " (fols. 167–168). " I said if he and Mrs. Miller did not marry in New York State, after securing the Mexican divorce, but were married instead *in a State permitting such marriage*, that Paster could do nothing about it " (fols. 169–170). (Italics supplied.)

This attorney was thereupon directed to proceed with the procurance of a divorce in Mexico (fol. 171).

From this point the chronology possesses potential significance. " On or about the 18th day of December, 1934, a divorce decree " was " granted to Claire Paster by the Court of First Instance of the Third Judicial District in the State of Tama Ulipas, Mexico " (fol. 172).

" Pursuant to the legal advice that he [the decedent] had received we [he and Claire] were married in the State of New Jersey on December 31, 1934, immediately after we received word of the entry of the Mexican divorce decree " (fol. 33).

" This Last Will and Testament was executed by Edward H. Miller at the office of David Harrison on January 2nd, 1935, immediately after our marriage " (fol. 33).

In the selection of the foregoing excerpts from the record on appeal this court has, except in respect to the excursion or excursions of the parties to Mount Clemens, Mich, intentionally confined itself to assertions made in the papers submitted by and on behalf of Claire. These, being statements of fact, are obviously binding upon her as admissions. (*Paige* v. *Willet*, 38 N. Y. 28, 31; *Robertson* v. *Sayre*, 134 id. 97, 99; *Thompson* v. *Postal Life Ins. Co.*, 226 id. 363, 368; *Sims* v. *Farson*, 162 App. Div. 426, 431; affd., 220 N. Y. 710; *Pennacchio* v. *Greco*, 107 App. Div. 225, 227; *Levy* v. *Delaware, L. & W. R. R. Co.*, 211 App. Div. 503, 505; *Rosenzweig* v. *Schmitt*, 232 id. 131, 133; *Syragusa* v. *Metropolitan Life Ins. Co.*, 248 id. 809.)

In addition to the facts actually demonstrated, the daughter would appear to be entitled to certain inferences naturally deducible from these facts. Two of these will be noted. The decedent obviously desired to contract a valid marriage with Claire. He

was admittedly advised that this could not be done in New York State with only a Mexican " divorce " as a preliminary. He was advised that this was possible " in a State permitting such marriage " (fol. 170). The natural inference from this statement was that there were States which recognized the validity of a marriage under such circumstances. Immediately succeeding his notification of the completion of the Mexican proceeding, he went through a marriage ceremony with her in the State of New Jersey. This, of itself, would raise a natural inference that the attorney whom Claire had brought to him had advised him that under New Jersey law such a marriage was valid, even in the absence of the express admission (fol. 33) that his act in this regard was " pursuant to " that advice.

The law of a foreign jurisdiction is, of course, a pure question of fact (*Hull* v. *Mitcheson*, 64 N. Y. 639, 640; *Phœnix Ins. Co.* v. *Church*, 81 id. 218, 226; *Robb* v. *Washington & Jefferson College*, 185 id. 485, 496; *Genet* v. *Delaware & Hudson Canal Co.*, 163 id. 173, 177; *Croker* v. *Croker*, 252 id. 24, 26; *Van Wyk* v. *Realty Traders, Inc.*, 215 App. Div. 254, 256; *Storrs* v. *Northern Pac. Ry. Co.*, 148 id. 403, 406; affd., 208 N. Y. 629; *Matter of Smith*, 136 Misc. 863, 877) which, like any other fact, would seem capable of misrepresentation. *Lefferts* v. *Lefferts* (243 App. Div. 278), upon which the appellant relied for a contrary determination, is not in point since the representation in that case, as stated in the opinion (p. 279) was that under the facts surrounding the parties " a marriage in Indiana would be * * * recognized by courts of competent jurisdiction everywhere," which phrase obviously included a representation of validity in this State. In view of the principle that *ignorantia legis neminem excusat*, which is in practice frequently deemed the substantial equivalent of a true presumption of law that every citizen is conclusively presumed to know the laws of his own jurisdiction (*Matter of Callahan*, 142 Misc. 28, 32; affd., 236 App. Div. 814; affd., 262 N. Y. 524; *Matter of Jackson*, 138 Misc. 167, 170), it would logically follow that a misstatement of a fact in respect to which the person addressed was conclusively presumed to have positive knowledge to the contrary, could not form the basis of an action for fraudulent misrepresentation.

In the present instance, however, the record indication is that the representation was in respect to the law of the State of New Jersey, knowledge of which by a resident of New York will not be presumed. (*Doll* v. *Earle*, 65 Barb. 298, 302; affd., 59 N. Y. 638; *Matter of Callahan*, 142 Misc. 28, 34; affd., 236 App. Div. 814; affd., 262 N. Y. 524; *Bank of Chillicothe* v. *Dodge*, 8 Barb. 233, 237.)

It may be observed parenthetically that the representation respecting the fact of the law of New Jersey was apparently

untrue since except in polyandrous jurisdictions, of which New Jersey cannot be presumed to be one, a woman may not contract a valid marriage who has a living and undivorced husband, and the decisions of the State of New Jersey indicate as strongly as those of New York that a Mexican " mail-order " divorce is not deemed efficacious for that purpose. ( *Newton* v. *Newton*, 13 N. J. Misc. 613, 616; 179 A. 621; *Reik* v. *Reik*, 109 N. J. 615, 627; 158 A. 519. See, also, *DiBrigida* v. *DiBrigida*, 116 N. J. Eq. 208, 218; 172 A. 505.)

An additional inference would appear to flow naturally from the facts, namely, that the accomplishment of a valid marriage with Claire was a material consideration in inducing the decedent to execute the propounded instrument. From the time of the inception of their relationship in 1931, he was legally free to make a will leaving her all or so much of his property as he desired. Yet he did not do so until *after* the news of the rendering of the Mexican decree had been communicated to him and *after* the performance of the New Jersey ceremony which, Claire's attorney had represented to him, would make them legally man and wife under the laws of that State. Without affirming that the sequence of events is too strong to be dismissed as a coincidence, it would appear to supply an inference which a jury might permissibly draw.

Such is the demonstration of the record which the majority of the Appellate Division has determined to disclose " a complete failure * * * to set forth facts forming a basis for the belief that she has a reasonable expectation of success in contesting the will."

The sole office of this court in the present connection is to ascertain whether the showing of the newly-submitted affidavits adds anything material to the foregoing " complete failure."

These are four in number and are made, respectively, by the applicant daughter, by her husband, by her brother and by a chauffeur formerly in the employ of the decedent. They total thirty-six pages in length.

The affidavit of the daughter recites the proceedings heretofore had and incorporates by reference the various papers included in the appeal book, which were a part of the adjudicatedly inadequate previous demonstration. She thereupon argues, on advice of counsel, respecting the incorrectness of the appellate determination and devotes three pages to excerpts from the former record. The entire balance of the affidavit is devoted to a restatement of her position and to observations concerning events which occurred subsequent to the execution of the will, which have no conceivable relevancy to the issue of whether or not the decedent was induced to execute it as a result of material misrepresentations.

Her husband also reiterates and reincorporates in his affidavit the statements contained in the record, the balance of his averments being devoted to *tu quoque* assertions, events alleged to have occurred subsequent to the execution of the will and other immaterialities.

The affidavit of decedent's former chauffeur cannot be deemed to add anything of controlling and vital importance. It tends to substantiate the existence of meretricious relations between the decedent and Claire which are not only reasonably obvious on the original record but are wholly immaterial in any event (*Matter of Hernandez*, 158 App. Div. 815, 816), and further states facts which might raise an inference that she was a mercenary adventuress who sought and attained a rather complete domination over the decedent and used her influence over him in an attempt to alienate him from his children. Aside from this, there is nothing shown which was not far more cogently demonstrated in the record on appeal.

The final affidavit, which is that of the would-be contestant's brother, indorses the statements of the others and then devotes nine of its remaining ten pages to denials and explanations of statements made by and on behalf of Claire respecting events which occurred subsequent to the execution of the will which are wholly immaterial on the issue of whether or not that instrument was the product of fraud and undue influence. The affidavit then terminates with the categorical conclusory allegation that the decedent " at all times " believed that " the Mexican divorce decree was legal."

In view of the determination of the Appellate Division that the former record was a " *complete* failure " for the purpose of demonstrating a probability of success, it would appear that an affirmative determination on the present application could be attained only upon a wholly *de novo* demonstration of merits independent of the former record which has been declared to be worthless for the purpose. Such a showing is obviously impossible of deduction from these additional papers. The law of the case as declared by the Appellate Division is binding here. Since the former demonstration has been determined to be wholly inadequate there can be no possibility for diversity of opinion that the present wholly insignificant addition cannot be deemed to remedy the defect. This court is accordingly constrained to determine that the daughter has not sustained the burden of demonstration which the majority of the Appellate Division has held to be imposed upon her.

Enter order on notice in conformity herewith.